UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. 12-10143 |
| OFFSHORE CONSTRUCTION & DIVING CO., INC. | CHAPTER 7 |
| DEBTOR | SECTION "B" |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MICHAEL M. EYMARD, LOUIS J. EYMARD,
RAIMY D. EYMARD,
OFFSHORE CONSTRUCTION & DIVING CO., INC. AND
BARBARA RIVERA-FULTON, CHAPTER 7 TRUSTEE
    Plaintiffs

VERSUS                                                                                      ADV.P. NO. 12-1008

AVIS BOURG, JR.
    Defendant

## MEMORANDUM OPINION

This matter came before the court as a trial on the complaint of Michael M. Eymard, Louis J. Eymard and Raimy D. Eymard (the "Eymards") against Avis Bourg, Jr. ("Bourg"). The Eymards, three of five co-guarantors on a promissory note, paid the balance owed on the note in full and then sued to collect co-guarantor Bourg's virile share under Louisiana law. For the reasons set forth below, the court finds that Bourg is liable to the Eymards for his virile share ($102,649.79) plus interest at the federal judicial rate from the date of demand until paid.

I.   **Background**

   A.   **Procedural Background**

This adversary proceeding represents a removed state court suit.[1] Barbara Rivera-Fulton, the Chapter 7 trustee for the debtor, Offshore Construction & Diving Co., Inc., was added as a plaintiff. The lawsuit began as a petition by the Eymards in Louisiana state court on a promissory note and to enforce a commercial guarantee that Bourg, a shareholder of the debtor, had signed to guarantee a loan made to the debtor, Offshore Construction and Diving Company, Inc. ("OCD" or the "debtor"). The loan, which was for up to $2,000,000, was also guaranteed by the other four shareholders of the debtor, namely the Eymards and another individual, Omar Bassa, who at the time of the loan was president of the debtor.[2] On February 2, 2011, the Eymards paid the $513,248.95 balance of the note[3] to the bank that held the note, and in turn the bank executed an act of transfer and assignment assigning the note and the collateral to the Eymards.[4] On February 11, 2011 the Eymards filed their petition in state court seeking to collect $205,640.94 from

---

[1] Case No. 117074 filed in the 17th Judicial District Court for the Parish of LaFourche, State of Louisiana.

[2] Exhibit 11, promissory note. Bassa, the former president of the debtor who was fired by the Eymards, was <u>not</u> named as a defendant in the state court suit or the removed suit that became this adversary proceeding. No explanation was given for not including him for his liability as a guarantor of the note.

[3] (P-74), Pre-trial order, statement of uncontested facts at ¶ (i).

[4] Exhibit 17.

Bourg as his portion of the balance on the note that the Eymards had paid off to the bank.[5]

On January 17, 2012 an involuntary Chapter 7 petition under the U.S. Bankruptcy Code was filed against the debtor by the Eymards. No answer was filed, and on February 13, 2012 this court entered an order for relief pursuant to 11. U.S.C. § 303(h). On February 15, 2012 Bourg removed the state court suit against him to this court. When the case was removed it was set for a hearing on a motion for summary judgment that had been argued but had not yet been ruled on by the state court. This court ruled on the summary judgment motion on September 28, 2012,[6] and while that ruling disposed of some of the issues, there remained issues for trial that were tried on January 17, 2013.[7]

### B.    Findings of Fact

The debtor was incorporated in 2007, with five shareholders.[8] The three Eymards and Bourg each held 17.5% of the shares, and Omar Bassa, who is not a party to these

---

[5] It is unclear where this amount came from. In this court's order on the Eymards' motion for summary judgment, the parties agreed and this court held that the maximum amount of Bourg's liability on the note was $102,649.79, which is one-fifth of the amount that the Eymards paid to the bank. (P-64) Order on motion for summary judgment.

[6] (P-63) Opinion on motion for summary judgment; (P-64) Order on motion for summary judgment.

[7] (P-64). The ruling on the summary judgment limited the Eymards' recovery from Bourg to one-fifth of the amount they paid to Community Bank, and dismissed Bourg's detrimental reliance defense. It preserved for trial the issues of fact related to Bourg's unclean hands defense. Bourg's answer also raised other defenses that the court did not specifically rule on in the motion for summary judgment.

[8] Exhibit 1.

proceedings, held 30% of the shares.[9] On December 19, 2008, the debtor, through its president, Bassa, executed a business loan agreement, a commercial security agreement, and a promissory note with Community Bank for $2,000,000.[10] Each of the Eymards and Bourg executed a commercial guarantee, also on December 19, 2008, which in identical terms guaranteed the debtor's indebtedness to Community Bank.[11] The parties stated that Bassa also executed a commercial guarantee identical to the others, but that document was not entered into evidence at the trial.[12] On February 2, 2011 the Eymards paid the remaining balance of $513,248.95 on the loan out of their personal funds,[13] and Community Bank executed an Act of Assignment and Notarial Endorsement of Promissory Note and Collateral that assigned the note executed by the debtor and all collateral securing that note to the Eymards.[14] Approximately a week later, on February 11, 2011 the Eymards filed their suit against only Bourg in state court.[15]

---

[9] Trial Exhibit 2.

[10] Trial Exhibits 10, 11 and 12.

[11] Trial Exhibits 13, 14, 15 and 16.

[12] Trial transcript at p. 12. It is not surprising that Bassa's guaranty was not entered into evidence; he was not a party to the litigation, and the Eymards had agreed when arguing the motion for summary judgment in this court that Bourg's virile portion was only one-fifth.

[13] Trial transcript at p. 17-18.

[14] Trial Exhibit 17.

[15] Case No. 117074 filed in the 17th Judicial District Court for the Parish of LaFourche, State of Louisiana. There is no explanation as to why the Eymards did not also sue Bassa, who had executed the same form of guaranty as Bourg.

Bourg's defense primarily depends on his assertion that a series of transactions between the debtor company and another company, Offshore Marine Contractor, Inc. ("OMCI"), in which the three Eymards and Bourg were each 25% shareholders, were somehow fraudulent or conducted in a deceptive way. Thus, some background information on the relationship between these corporate entities is necessary. OMCI was formed as a lift boat company before the debtor company was formed. Bourg became a shareholder in OMCI on May 27, 2005.[16] The debtor, a pipe laying business, was incorporated in 2007 as a complementary business to OMCI's lift boat business. The Eymards and Bourg also formed two other companies, in which they were each 25% shareholders, that were complimentary to OMCI's business.[17]

The parties all seemed to get along well for several years[18] until Bourg and Michael Eymard, the father of the other two Eymards, had a falling out over the proposed sale of two boats, in February 2010.[19] Michael Eymard had been trying for a year and a half to put together a transaction in which all of the companies in which the parties were

---

[16] *Bourg v. Offshore Marine Contractors, Inc.,* 2012 WL 1564663 at *1 (La.App. 1 Cir.).

[17] There was an aviation business and a small shipyard, each of which had a membership of 25% each held by the three Eymards and Bourg. Trial transcript at p. 154.

[18] Not only did the parties get along, the entire relationship of Bourg with the entities was quite beneficial to him and his family. Raimy Eymards's uncontested testimony was that Bourg was paid a salary and other benefits that total five to six million dollars for the time Bourg was affiliated with the debtor and OMCI. Trial transcript at p. 210. Bourg testified that his son and his son-in-law both worked for OMCI - the son as a vice-president of sales. Trial transcript at p. 196.

[19] Bourg testified that he felt that Michael Eymard was trying to cheat him out of his share of the profits on the sale of the boats. Trial transcript at p. 168-69 and 171-74.

5

shareholders would be sold to a third party.[20] Bourg was supportive of this effort; however, sometime in July 2010 it became apparent that the sale would not happen. At that point, Michael Eymard offered to buy out Bourg's share of the companies, but they could not reach an agreement on the price.[21]

On September 1, 2010 Bourg was terminated by OMCI.[22] In November 2010 Bourg filed a writ of mandamus against OMCI and the other related corporations in state court demanding access to the books and records of the corporations in which he was a stockholder.[23] The Eymards, through OMCI responded by challenging Bourg's membership in OMCI. Bourg prevailed in the state court suit, and eventually the state appellate court affirmed that Bourg was in fact a 25% shareholder in OMCI.[24] It was after this litigation had begun that the Eymards paid the debtor's note and then sued Bourg for his share of the amount paid to Community Bank, the previous holder of the note. When Bourg answered the Eymard's suit against him on the note, he also filed a reconventional demand against the Eymards.[25]

---

[20] Trial transcript at p. 166-67.

[21] Trial transcript at p. 167 and 174-77.

[22] Trial transcript at p. 186.

[23] Case No. 116416 filed in the 17th Judicial District for the Parish of LaFourche, State of Louisiana.

[24] *Bourg v. Offshore Marine Contractors, Inc.,* 2012 WL 1564663 (La.App. 1 Cir.).

[25] Bourg amended his answer and reconventional demand twice. The reconventional demand consisted of a derivative action, which became property of the debtor's estate upon the filing of this bankruptcy case. The trustee filed a motion to approve a compromise of the

The specific transactions Bourg complains of are as follows: 1) a payment from the debtor to OMCI in the amount of $100,000 made on August 21, 2009;[26] 2) a payment from the debtor to OMCI in the amount of $300,000 made on September 29, 2009;[27] 3) a transfer of equipment from the debtor to OMCI for which a credit of $94,000 was given to the debtor in January 2010;[28] and 4) a payment from the debtor to OMCI in the amount of $28,200 made on February 3, 2011.[29] It was never made clear in the pleadings, the evidence, or the briefs why transfers from a corporation (OCD) in which Bourg owns 17.5% of the stock, which corporation is now in bankruptcy, to a corporation (OMCI), not in bankruptcy, in which Bourg owns 25% of the stock, caused damage to Bourg. Any cause of action or complaint as to the legality of these transfers would seemingly belong not to Bourg but to the trustee of the debtor, OCD.

## II. Legal Analysis

In his answer, Bourg raised five affirmative defenses: breach of fiduciary duty, detrimental reliance, failure to mitigate damages, doctrine of unclean hands, and unjust enrichment. The court has already dismissed the detrimental reliance defense in its order on the motion for summary judgment. The court's order in the summary judgment case

---

derivative claim in which the Eymards agreed to pay $45,000 to the trustee in full settlement of any claim the trustee may have against them; (P-29) in the main bankruptcy case.

[26] Trial transcript at p. 34; Trial exhibit 26.

[27] Trial transcript at p. 35; Trial exhibit 27.

[28] Trial transcript at p. 36-37; Trial exhibit 8.

[29] Trial transcript at p. 52-53; Trial exhibit 28.

specifically said that there were issues of fact to try with respect to the unclean hands defense. The court did not address the remainder of the defenses in its summary judgment order.

### A. Detrimental Reliance

Bourg urges the court to reconsider its ruling dismissing the detrimental reliance defense. As the court stated in its reasons for order on the motion for summary judgment dated September 28, 2012[30] Bourg has not proved the elements of detrimental reliance as to his initial signing of the guarantee with the bank. Bourg concedes this in his brief but argues that the court should find he relied to his detriment on statements Michael Eymard allegedly made promising that OMCI would pay off the note to Community Bank on behalf of the debtor. A party alleging detrimental reliance must prove by a preponderance of the evidence: 1) a representation by conduct or word; 2) justifiable reliance; and 3) a change in position to one's detriment.[31] Assuming, for the sake of analysis, that Bourg proved 1) and 2), Bourg fails to point the court to any actions he would have taken differently had Eymard not made those statements. His detrimental reliance defense fails on this point alone as well as for the reasons given in the reasons for order of September 28, 2012.

---

[30] (P-63).

[31] *Ameritech U.S.A., Ltd. v. Nottingham Construction Co.,* 57 So.3d 1073 (La.App. 1 Cir. 2010).

### B. Clean Hands Defense

The clean hands doctrine provides that a person cannot maintain an action, if in order to establish his cause of action, he must rely in whole or in part, on any illegal or immoral act or transaction to which he is a part.[32] Bourg's post-trial brief addresses this argument only in passing, using less than 2 pages of his 25 page brief and not addressing the issue at all in his reply brief. Many of the cases Bourg cites are all completely different situations than that now before the court. Two of the cases, *Hines v. Bick*, 566 So.2d 455 (La.App. 4 Cir. 1990) and *Guille v. Comprehensive Addiction Programs*, 735 So.2d 775 (La.App. 4 Cir. 1999), involve former mental patients, who had committed crimes, seeking to sue the psychiatric facilities in which they had received treatment for their respective mental illnesses for failing to prevent them from committing said crimes. The court does not see the relevancy of these cases.

A third case cited by Bourg, *Hall v. Wright*, 240 F.2d 787 (9th Cir. 1957), was a 9th Circuit case from 1957, which Bourg cites for the proposition that, "the 'clean hands' doctrine mandates that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands or he will be denied relief, regardless of the merits of his claim."[33] Bourg does not cite the language in the rest of the case that states: "In applying the clean hands maxim, the court is 'concerned primarily with protecting its own

---

[32] *Redar, LLC v. Rush,* 51 So.3d 859, 868 (La.App. 3 Cir., 2010).

[33] Bourg's post-trial brief (P-82) at p. 22.

integrity from improper action by a party."[34] The Ninth Circuit went on to summarize the facts of the case before it and then stated:

> The conclusion from these facts, that the parties were guilty of unclean hands, was based partly upon the view that the described conduct was inequitable regardless of the pendency of this suit. But the prime consideration which led to the conclusion in question was unquestionably the fact that, as established by the findings, each party indulged in self-help after this action was instituted.
>
> We think the court was entirely correct holding that such acts of self-help called for application of the doctrine of unclean hands. None of the parties was content to rely, for relief, on adjudicatory processes which were placed in motion when this suit was filed. Each waged battle not only in this case, but in other cases thereafter instituted, and on a dozen business fronts here and abroad. While each party can doubtless find justification for his conduct in some instances, the over-all flavor smacks too plainly of self-help to be overlooked.[35]

The *Hall v. Wright* case cited by Bourg is not on point with the facts before this court.

Bourg's clean hands defense fails not only for lack of supporting legal authorities but as a factual matter. Bourg never really pinpoints whose hands were dirty and in what respects this injured him. Presumably, it was acts of the Eymards, especially Michael, in transferring cash and equipment from the debtor to OMCI. Those acts had nothing to do with Bourg executing the guaranty and occurred quite some time after the loan by the bank and the execution of the guaranties. Also, Michael Eymard testified unequivocally that Bourg not only knew of the transfers from OCD to OMCI but was in favor of the

---

[34] *Hall v. Wright*, 240 F.2d 787, 795 (9th Cir. 1957)

[35] *Hall v. Wright*, 240 F.2d 787, 796 (9th Cir. 1957)

transfers.[36] The two largest transfers were in 2009, the same year that OCD declared a $1 million dividend that Bourg certainly benefitted from.[37] Raimy Eymard testified absolutely that Bourg participated in financial decisions for OCD.[38]

On the other hand, Bourg failed to testify clearly that he was not involved in the decisions and actions of both OCD and OMCI - he was on the board of directors of both corporations - that he now claims constitute the basis for his argument that the Eymards were guilty of "unclean hands." If the court should find, which it does not, that the Eymards engaged in any illegal or immoral act in connection with the transfers, Bourg was aware of and a part of the same actions.

The clean hands defense requires illegal or immoral conduct. Bourg has failed to prove that there was illegality or immorality in connection with the transfers. Even if such existed, Bourg lost his standing to raise these points when the bankruptcy petition was filed as any legal action for such misdeeds belongs to the trustee. As to the later actions of the Eymards, the court finds nothing illegal or immoral in the Eymards actions in paying the note in full and then suing Bourg for his virile portion. And none of the facts adduced at trial nor in the short argument set forth in Bourg's brief convinces the court otherwise.

---

[36] Michael Eymard testified that although he couldn't specifically state the date that it was discussed, Bourg knew of the August 2009 transfer of $100,000. Trial transcript at p. 129-30.

[37] Exhibit 36 shows that on February 10, 2009 Bourg was paid $170,000 in dividends. He complains in his testimony that no meeting of the Board of Directors authorized this dividend, but he certainly accepted it.

[38] Trial transcript at p. 55-56.

### C. Other Defenses

The other defenses - breach of fiduciary duty, failure to mitigate damages and unjust enrichment - need be discussed only briefly. All three are long on theory but, short on both a factual and a legal basis.

### 1. Breach of Fiduciary Duty

Bourg never makes clear what fiduciary duty was owed to him that was breached. Although Bourg argues that in general the Eymards owed a fiduciary duty to him, he fails to identify specifically what that fiduciary duty is in this case and how it was breached.[39] Bourg simply failed to show any fiduciary duty was owed <u>to him</u> or that any fiduciary duty owed to the Bank had been breached. The court should not have to search for the law and evidence to support Bourg's theories.[40] Even if the court accepted the theory that the Eymards had a fiduciary duty <u>to Bourg</u> to pay the bank instead of OMCI - a highly dubious theory lacking a legal or factual foundation in this case - it ignores certain clear facts fatal to its applicability here such as: a) There is no evidence that the bank loan was in default at the time of these transfers to OMCI; b) Bourg had no evidence that OMCI had not loaned money to OCD. The evidence elicited by the Eymards showed that OMCI had advanced a total of $2,475,124.77 to OCD and that some of these sums were used by

---

[39] There is not a separate section in Bourg's post trial memorandum (P-82) regarding breach of fiduciary duty, and his reply memorandum (P-86) complains only of certain representations that the Eymards made to the Bank, and his charges on this.

[40] Bourg cited no cases showing a fiduciary duty is owed from one shareholders to another or from one officer or director to another. The question of whether there was a breach of the fiduciary duty owed from officers or directors to the debtor is part of the trustee's suit.

12

OCD to pay the bank loan;[41] and c) Bourg participated in and benefitted from the $1 M dividend paid to shareholders of OCD. In short, there was no fiduciary duty shown as owed by the Eymards <u>to</u> <u>Bourg</u>.

### 2. Failure to Mitigate Damages

This appears to be an argument made in passing on the part of Bourg. This defense is not separately briefed or argued by Bourg, and it certainly was not supported by any evidence. It can thus be disposed of by pointing out that no damages are shown to be owed to Bourg by the Eymards, so how can there be a failure to mitigate damages. If the theory of mitigation of damages has any applicability at all in this case it would only apply to the potential damages Bourg could have owed to the bank. The evidence showed that Bourg of his own free will guaranteed his virile portion of the bank loan up to $2 million, of which amount Bourg is called upon to pay the Eymards only $102,649.79, representing one-fifth of the balance owed when the Eymards paid the note.

### 3. Unjust Enrichment

The last of Bourg's special defenses - unjust enrichment - suffers the same fate as the others discussed above. Bourg's briefs do not contain a separate discussion of his unjust enrichment defense. Thus the court is hard pressed to understand his argument that the Eymards were some how unjustly enriched. Payment by three people from their personal funds of the entire balance on a bank debt guaranteed by five people without any right to contribution from two of these five is a strange sort of enrichment. Each of the

---

[41] Trial transcript at pp. 131-32, 203-07; trial exhibits 19, 22 and 23C.

Eymards were indebted on the guarantees for the full amount of their virile portion of the $2 million loan just as Bourg was. The debtor managed over the almost 3 year life of the loan, December 19, 2008 to February 2, 2011, to pay down the obligation to $513,248.95 which the Eymards then paid the bank in full. Bourg's original obligation to the Bank was one-fifth of $2 million, or $400,000. Thus, before the payment of the note by the Eymards, Bourg could potentially have been called upon to pay that amount to the bank had the debtor defaulted on the note. Because the Eymards paid the balance on the note, Bourg was relieved of much of his original $400,000 obligation *in solido* to the bank, but a concomitant obligation arose to pay to the Eymards this virile portion - $102,649.79.

It is difficult to see how there was an unjust enrichment of the Eymards who paid out $513,248.95 of their personal funds to the bank and are left with a judgment against Bourg for $102,649.79, which may or may not be collectible. There is no unjust enrichment involved in the Eymards seeking to hold Bourg for his virile portion of the balance owed on what was originally a $2 million debt. By the same reasoning, there was no unjust enrichment to the Eymards in having the debtor declare and pay a dividend which Bourg participated in according to his stock ownership.

Nor was there any unjust enrichment to the Eymards by the debtor transferring the cash payments and certain movables to OMCI because: a) at the time of the transfers, the OCD debt was not in default; 2) the sums lent from OMCI to OCD were used in part to pay down the bank debt of OCD; and 3) Bourg had a 25% stock ownership in OMC as compared to a 17.5% ownership in OCD. In short, Bourg has failed to show how his plea

of unjust enrichment plays any role in this case.

### III.  Conclusion

Bourg has no standing to raise the many misdeeds he ascribes to the Eymards. Whatever causes of action the debtor has here have been properly raised by the trustee and are being compromised and settled by the trustee and the Eymards, which, if approved by the court, will result in a cash payment to the debtor's estate for the benefit of all the creditors. All of the theories and arguments by Bourg are not well founded in law or fact and are thus rejected by the court in toto.

There is no equitable or any other form of unfairness in requiring Bourg to pay his virile portion of the bank debt paid by the Eymards. A separate judgment in favor of the Eymards for $102,649.79 plus interest at the federal judicial rate from the date of demand will be entered.

New Orleans, Louisiana, July 26, 2013.

                                                        Jerry A. Brown
                                                       U.S. Bankruptcy Judge